## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **SYED AMMAR AHMED**, | CASE No.: |
| *Plaintiff*, | |
| vs. | CIVIL ACTION |
| **THE DISTRICT BOARD OF TRUSTEES FOR INDIAN RIVER STATE COLLEGE, FLORIDA ("IRSC"); DR. TIMOTHY E. MOORE**, in his individual capacity, **JOHN/JANE DOE FLORIDA BOARD OF EDUCATION MEMBER**, in their individual and official capacity, | **COMPLAINT** **JURY TRIAL DEMANDED** |
| *Defendants*. | |

Plaintiff Syed Ammar Ahmed ("Plaintiff" or "Professor Ahmed") by and through undersigned counsel, files this Complaint against Defendant The Board of Trustees for Indian River State College, Florida ("IRSC"), Defendant Dr. Timothy Moore, in his individual capacity, and John/Jane Doe Florida Board of Education Member, in their individual and official capacity ("Doe Board Member") (together, "Defendants"). Plaintiff presents the following claims for relief and supporting factual background.

### I.     INTRODUCTION

Plaintiff Syed Ammer Ahmed has dedicated his career to serving his community, both through serving as an adjunct professor and working for various nonprofit organizations in his home state of Florida. Professor Ahmed is also a practicing Muslim of South Asian descent. Defendants IRSC and Dr. Moore violated Professor Ahmed's rights by terminating him from his employment based solely on his race and religion and retaliating against him for protected speech. Defendant Doe Board Member, along with Dr. Moore and IRSC through its agents, conspired

1

against Professor Ahmed to violate his civil rights by working to have him terminated simply because Defendants disapprove of Professor Ahmed's religion. This case, however, is bigger than this single termination; it reflects a troubling pattern of hostility towards American Muslims living in Florida, emanating from the highest levels of the Florida government. The law does not countenance this behavior. Therefore, Professor Ahmed asks this Court to declare that the actions Defendants took against him violated the law, award him damages, and enjoin further violations.

## II.    PARTIES

1.    Plaintiff Syed Ammar Ahmed ("Plaintiff" or "Professor Ahmed") is a resident of Palm Beach County, Florida, over the age of 18 years, and otherwise *sui juris*.  Professor Ahmed is, and was at all relevant times, an "employee" of IRSC within the meaning of Title VII based on his employment as an Adjunct Instructor at Indian River State College ("IRSC") since 2019. Professor Ahmed is a practicing Muslim of Pakistani ancestry. He brings this action to redress violations of his constitutional and statutory rights arising from IRSC's discriminatory conduct.

2.    Defendant The Board of Trustees for Indian River State College, Florida ("IRSC") is a public institution of higher education within the State of Florida. IRSC employs well over fifteen employees and is therefore an "employer" subject to Title VII of the Civil Rights Act of 1964. Congress has expressly abrogated state sovereign immunity for Title VII claims. *See*, *Allen v. Ala. State Bd. of Educ.*, 816 F.2d 575, 577 (11th Cir. 1987). At all relevant times, IRSC acted under color of state law and is responsible for the unlawful acts of its officials, employees, and agents.

3.    Defendant Dr. Timothy Moore ("Dr. Moore") is, and at all relevant times was, the President of Indian River State College. He is sued in his individual capacity as the chief executive

officer responsible for the administration, supervision, and oversight of IRSC—including personnel decisions and directives in response to purported security concerns involving faculty. At all relevant times, Dr. Moore acted under color of state law. He is also sued in his personal capacity for damages. Dr. Moore authorized, condoned, or failed to prevent discrimination against Professor Ahmed and interfered with Professor Ahmed's contractual rights in violation of the law.

4. Defendant John/Jane Doe, sued in their individual and official capacities, is a current or former member of the Florida State Board of Education within the Florida Department of Education, the state agency responsible for oversight of public colleges, implementation of state education policy, and supervisory authority over institutions such as IRSC. Their identity is presently unknown. Upon information and belief, this Defendant exercised, authorized, or directed the unconstitutional and unlawful actions taken against Professor Ahmed.

### III.   JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the First and Fourth Amendments to the United States Constitution and Title VII of the Civil Rights Act of 1964.

6. This Court also has jurisdiction under 28 U.S.C. § 1343 because the action seeks to address the deprivation of civil rights protected by 42 U.S.C. § 1981 via 42 U.S.C. § 1983.

7. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the events that give rise to this action occurred in this district.

### IV.   STATEMENT OF FACTS

8.    Professor Ahmed began his employment at IRSC as an adjunct professor on June 26, 2019.

3

9.      For nearly five years, IRSC employed Professor Ahmed with no disciplinary issues.

10.     However, in January 2024, Professor Ahmed noted that he was not on the schedule for the Spring 2024 semester and reached out to Dr. Scott Stein, Dean of Liberal Arts to ask whether there was any reason he was not on the schedule. He received no response.

11.     On March 1, 2024, Jennifer Brown, then Chief Human Resources Officer at IRSC called Professor Ahmed and informed him that he was terminated effective immediately.

12.     She followed up with an email that informed him that IRSC's Chief of Campus Safety received a security alert from "the FDLE" which "stated [Professor Ahmed] appeared on the FDLE Homeland Security database due to terrorist threats." *See* Exhibit A, Excerpts from Florida Public Records production at 2-3.

13.     Though the allegation was patently false, Professor Ahmed received no chance to rebut the statements and was instead terminated immediately.

14.     Professor Ahmed responded by pointing out that the university fingerprinted him when he was hired, that he had been subsequently hired by other area colleges and passed their background checks, obtained TSA Pre-Check, and previously worked as a federal government contractor, for which he was required to pass a background check and earn security clearance. None of those other background checks raised any issues. *Id.*

15.     Ms. Brown directed Professor Ahmed to Salvatore Cardella, then Chief of Campus Safety for IRSC who directed Professor Ahmed to an article about Professor Ahmed. *See* Exhibit B, article by Joe Kaufman, Muslim Group Parts Ways with Professor Who Joked About Blowing Up School, Front Page Mag. (Mar. 10, 2020), https://www.frontpagemag.com/muslim-group-parts-ways-professor-who-joked-about-joe-kaufman/.

16.     The article, written by Joe Kaufman, asserted that Professor Ahmed is "an Islamist/racist/Socialist professor who once joked that he should have threatened to blow up a school." *Id.*

17.     The basis for these allegations was Professor Ahmed's affiliation with Emgage Action and the Islamic Circle of North America, both U.S. nonprofit organizations that advocate for and educate about Islam and Muslims in America.

18.     The article also linked to screenshots from Facebook posts from Professor Ahmed's Facebook page dating back to 2009-2013, when Mr. Ahmed would have been 15-19 years old. Exhibit C, Screenshots.

19.     The post in which he allegedly "joked that he should blow up a school" dates from 2010, when Professor Ahmed would have been 16 years old.

20.     Kaufman's article also asserts that Professor Ahmed has "terrorist ties" because he appears in pictures with an individual who once published works with another individual who was deported for terrorism-related charges.

21.     Based on these tenuous relationships, Professor Ahmed's work with legitimate U.S. nonprofits, and statements he made on social media as a minor, Kaufman asserts that "Ahmed … should cease activities, be shut down, and be shipped out of the US immediately."

22.     Upon learning from Mr. Salvatore that Kaufman's article motivated his termination, Professor Ahmed immediately sought to explain to Mr. Salvatore that Kaufman is a "non reputable messenger." Exhibit A at 1.

23.     He continued to follow up with Ms. Brown, but on April 26, 2024, Ms. Brown informed him that she had no updates and "was advised this is on hold for now." Exhibit A at 1.

24.    Between the time Professor Ahmed noticed in January 2024 that he was not scheduled for any classes to when he was informed on April 26 that his matter was 'on hold for now,' he persistently followed up and repeatedly sought clarity regarding his status.

25.    Seeking additional assistance, Professor Ahmed contacted the undersigned attorneys, who reached out to IRSC and also submitted a Florida Sunshine Act request for documents on August 20, 2024.

26.    IRSC responded to the Sunshine Act request on August 28, 2024, and within an hour of counsel receipt, IRSC contacted Professor Ahmed and informed him that he was reinstated to his position.

27.    Review of the released emails, excerpts of which are attached hereto as Exhibit A, reveals why IRSC was in such a rush to reinstate Professor Ahmed, despite putting his termination "on hold" for four months.

28.    On April 5, April Sanders, IRSC People and Culture Manager, sent an email to Mr. Cardella, copying Ms. Brown and Dr. Marvin Pyles, IRSC's Chief Financial Officer at the time, stating that Mr. Cardella "called [her] earlier to report that Syed Ahmed had been cleared and was not the same person that was reported to Jennifer Brown and several others weeks ago." She requested Mr. Cardella provide that information in writing. Exhibit A at 5-6.

29.    Mr. Cardella promptly responded on April 5, "Syed Ahmed has been cleared and no longer poses a threat to the college. Campus Safety and Security has closed all investigations related to him. Please update his employee file accordingly." Exhibit A at 5.

6

30. Ms. Brown responded that "There is more to this than just updating his file. We will await Marvin's reply. Please keep in mind I wrongfully terminated an employee based upon the information I was supplied." Exhibit A at 8 (emphasis in original).

31. Dr. Pyles then responded in that same email thread on April 5 to Mr. Cardella, Ms. Sanders, and Ms. Brown instructing Mr. Cardella to "have someone in your department (you or your command staff) reach out to Mr. Ahmed immediately and notify him that he has been reinstated to his status at the college." Dr. Pyles also instructed Mr. Cardella to let Professor Ahmed know that "the college apologizes for the misunderstanding." Exhibit A at 5.

32. Dr. Pyles further instructed Mr. Cardella to follow that phone call up with a letter that documents the reinstatement and apology. Dr. Pyles expressed that he expected Mr. Cardella to make that call and send that letter as soon as possible. Mr. Cardella responded that he would do that. Exhibit A at 5.

33. On Saturday, April 5, Ms. Brown responded and said that "it is in our best interest to follow up w/Syed sooner rather than later." She requested Mr. Cardella let her know as soon as his team had contacted Professor Ahmed, so that she could begin the necessary work on the Human Resources side to reinstate Professor Ahmed to active status. Exhibit A at 4.

34. On Monday, April 8, Ms. Sanders emailed the aforementioned thread participants saying Mr. Cardella has spoken with Professor Ahmed over the phone, and Mr. Cardella would be providing a letter for Melany Crawford, then General Counsel at IRSC, to review prior to it being sent to Professor Ahmed. Exhibit A at 4. She also informed them that the Spring 2024 schedule had already been set, so Professor Ahmed could not be re-added to the schedule until Fall 2024. *Id.*

7

35. However, though Mr. Cardella drafted a message to Professor Ahmed on April 8 informing him that he was reinstated, no one from IRSC ever sent that letter to Professor Ahmed. Exhibit A at 7.

36. Professor Ahmed received no further communication from IRSC until his reinstatement on August 28.

37. Despite Professor Ahmed being fully cleared and it being widely understood internally by April 5 that he had been 'wrongfully terminated,' he was still neither contacted nor reinstated until nearly five months later, on August 28.

38. Upon information and belief, Defendant Dr. Moore directed Dr. Pyles and Ms. Crawford to not send the letter reinstating Professor Ahmed on April 8 or at any time thereafter.

39. Dr. Moore's direct involvement is evident from an email sent from Meaghan Ashurst, Administrative Assistant to the Vice President, to Ms. Brown on March 1, the day of Professor Ahmed's termination, which stated, "I got the impression that Dr. Moore would like a status update asap." Exhibit A at 10.

40. Upon information and belief, Defendant Doe Board Member made Dr. Moore aware that Professor Ahmed worked at IRSC and of the existence of the Kaufman article from 2020 that made inflammatory statements about Professor Ahmed.

41. Upon information and belief, Defendant Doe Board Member encouraged Dr. Moore to terminate Professor Ahmed, and Dr. Moore, in turn, insisted on Professor Ahmed's termination, even after the Chief of Campus Safety determined that Professor Ahmed posed no threat to the school.

42. Upon information and belief, the only justification for Professor Ahmed's termination came from the 2020 Kaufman article, so instead of relying on that, Dr. Moore provided

Ms. Brown with the false information that Professor Ahmed appears on the "FDLE Homeland Security Database due to terrorist threats."

43. Upon information and belief, the "FDLE Homeland Security database" does not exist.

44. No one at IRSC has ever produced to Professor Ahmed or his undersigned counsel evidence of this supposed "security alert" beyond the article referencing comments Professor Ahmed made over a decade ago as a minor and the false assertion that Professor Ahmed was on "the FDLE Homeland Security database."

45. Finally, though IRSC reinstated Professor Ahmed on August 28, 2024, the reinstatement letter, signed by Autum Sanders, who was at this point serving as Interim Chief Human Resources Officer, informed Professor Ahmed that his teaching certification had expired as of May 14, 2024 and he was therefore ineligible for class assignments for the 2024 Summer and Fall semesters.

46. Professor Ahmed would have maintained an active teaching certification, but for IRSC's discriminatory termination in March 2024. He could not have applied for recertification prior to his reinstatement in August 2024.

47. Professor Ahmed immediately applied for recertification but was not assigned a class until Spring 2025. The total time he was unable to teach at IRSC was three semesters.

48. Defendants clearly discriminated against Professor Ahmed based on his religion and protected speech and associations. Their efforts to point to other justifications after the fact are clear pretext and do not absolve them of the violations of Professor Ahmed's rights.

49. Professor Ahmed, through undersigned counsel, submitted a charge with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 510-2025-04826, on February 20, 2025.

50. The EEOC issued Professor Ahmed a Notice of Right to Sue on September 4, 2025.

51. This lawsuit is being filed within 90 days of Professor Ahmed's receipt of the Notice of Right to Sue.  Therefore, all procedural requirements for the filing of his claims under Title VII have been met.

## V.   CAUSES OF ACTION

**Count I: Religious Discrimination in Violation of Title VII of the Civil Rights Act of 1964 (against Defendant Indian River State College)**

52. Plaintiff alleges and incorporates by reference paragraphs 1-51 above.

53. As a practicing Muslim, Professor Ahmed is a member of protected classes under Title VII.

54. Professor Ahmed was subjected to disparate treatment on the basis of his Islamic faith when Jennifer Brown, acting on behalf of IRSC, abruptly terminated him on the stated basis of his alleged appearance on an "FDLE Homeland Security" database due to "terrorist threats" - a claim that was false and unsupported by any real security information, but rather stereotypical associations between Muslims and terrorists.

55. He was fully qualified for his position and had nearly five years of successful service at IRSC without any disciplinary issues.

56. Despite Professor Ahmed's immediate efforts to clarify the error and provide documentation of his security clearance, TSA Pre-Check status, and prior background checks, IRSC refused to reconsider its decision and repeatedly informed him that the matter was "on hold."

57. By April 5, 2024, IRSC's own Chief of Campus Safety had confirmed in writing that Professor Ahmed was fully cleared and "did not pose a threat," and instructed that his employee file be updated.

58. IRSC officials intentionally withheld this information from Professor Ahmed and took no steps to reinstate him for months.

59. Upon information and belief, IRSC's President, Dr. Timothy Moore, pushed for Professor Ahmed's removal and later delayed reinstatement without a legitimate basis.

60. IRSC did not reinstate Professor Ahmed until August 28, 2024 only after his legal counsel initiated public-records inquiries.

61. Similarly situated non-Muslim adjunct instructors were not subjected to termination based on unverified security accusations, nor kept in limbo after being cleared.

62. Any justification offered by IRSC, including reliance on a nonexistent FDLE "Homeland Security" database or an outdated blog article, constitutes pretext for unlawful religious discrimination.

63. As a direct result of IRSC's discriminatory conduct, Professor Ahmed suffered lost income for more than six months, loss of teaching opportunities, lapse of his IRSC teaching certification, reputational harm, and emotional distress.

64. Professor Ahmed has satisfied all conditions precedent to suit under Title VII.

65. Accordingly, IRSC's conduct constitutes unlawful religious discrimination in violation of 42 U.S.C. § 2000e et seq.

**Count II: Race/National Origin Discrimination in Violation of Title VII of the Civil Rights Act of 1964 (against Defendant Indian River State College)**

66. Plaintiff alleges and incorporates by reference paragraphs 1-51 above.

67. As a practicing Muslim of Pakistani ancestry, Professor Ahmed is a member of protected classes under Title VII.

68. Professor Ahmed was subjected to disparate treatment on the basis of his race and/or national origin when Jennifer Brown, acting on behalf of IRSC, abruptly terminated him on the stated basis of his alleged appearance on an "FDLE Homeland Security" database due to "terrorist threats" - a claim that was false and unsupported by any real security information, but instead based on stereotypical associations between Muslims of Asian ancestry with foreign terrorists.

69. He was fully qualified for his position and had nearly five years of successful service at IRSC without any disciplinary issues.

70. Despite Professor Ahmed's immediate efforts to clarify the error and provide documentation of his security clearance, TSA Pre-Check status, and prior background checks, IRSC refused to reconsider its decision and repeatedly informed him that the matter was "on hold."

71. By April 5, 2024, IRSC's own Chief of Campus Safety had confirmed in writing that Professor Ahmed was fully cleared and "did not pose a threat," and instructed that his employee file be updated.

72. IRSC officials intentionally withheld this information from Professor Ahmed and took no steps to reinstate him for months.

73. Upon information and belief, IRSC's President, Dr. Timothy Moore, pushed for Professor Ahmed's removal and later delayed reinstatement without a legitimate basis.

74. IRSC did not reinstate Professor Ahmed until August 28, 2024 only after his legal counsel initiated public-records inquiries.

75.    Similarly situated adjunct instructors of non-Asian ancestry were not subjected to termination based on unverified security accusations, nor kept in limbo after being cleared.

76.    Any justification offered by IRSC, including reliance on a nonexistent FDLE "Homeland Security" database or an outdated blog article, constitutes pretext for unlawful race/national origin discrimination.

77.    As a direct result of IRSC's discriminatory conduct, Professor Ahmed suffered lost income for more than six months, loss of teaching opportunities, lapse of his IRSC teaching certification, reputational harm, and emotional distress.

78.    Professor Ahmed has satisfied all conditions precedent to suit under Title VII.

79.    Accordingly, IRSC's conduct constitutes unlawful race/national origin discrimination in violation of 42 U.S.C. § 2000e et seq.

**Count III: First Amendment Retaliation in Violation of 42 U.S.C. § 1983 (against all Defendants)**

80.    Plaintiff alleges and incorporates by reference paragraphs 1-51 above.

81.    Professor Ahmed exercised his First Amendment rights to engage in expressive activity and protected association.

82.    The "post" and article IRSC relied on in terminating him contained racist and Islamophobic characterizations of Professor Ahmed's protected associations and statements he allegedly made as a minor - associations and expressions that are constitutionally protected.

83.    Rather than disregard or investigate the obvious unreliable and discriminatory nature of this material, Defendants adopted it wholesale and treated it as a "security threat," using it as the basis for abruptly terminating Professor Ahmed on March 1, 2024, claiming without

evidence that he appeared on an "FDLE Homeland Security database" for "terrorist threats."

84. Defendants never produced any such alert, and IRSC later internally acknowledged the information was false.

85. Upon information and belief, Defendants took adverse employment action against Professor Ahmed because of the viewpoints and associations attributed to him in the article, which Defendants disfavored.

86. Professor Ahmed specifically informed IRSC that the article was from "a non-reputable messenger," yet IRSC continued relying on it as the stated basis for treating him as a threat.

87. Defendants' retaliatory conduct continued after termination.

88. IRSC's own Campus Safety office cleared Professor Ahmed and confirmed he "was not the same person" purportedly referenced. Despite this, Defendants withheld this exculpatory information, informed him that the matter remained "on hold," and failed to reinstate him for months.

89. Defendants did not reinstate him until August 28, 2024, and only after his legal counsel pursued a public-records request.

90. Defendants took these actions in direct response to protected associations and expression attributed to Professor Ahmed in the article IRSC relied upon, and because the viewpoints ascribed to him were disfavored by Defendants.

91. Defendants' actions—including immediate termination, prolonged withholding of clearance information, and months of refusal to reinstate—constitute retaliatory measures that would deter a person of ordinary firmness from engaging in protected expression and association.

14

92. Defendants' actions lacked any legitimate justification.

93. IRSC has never produced the alleged "security alert," and its own internal communications confirm that Professor Ahmed was cleared and that the original basis for termination was erroneous.

94. As a direct and proximate result of Defendants' unlawful retaliation, Professor Ahmed suffered lost wages, loss of teaching opportunities, lapse of his IRSC teaching certification, reputational harm, and emotional distress.

95. Defendants acted under color of state law and violated clearly established First Amendment protections. Their conduct gives rise to liability under 42 U.S.C. § 1983.

**Count IV: Conspiracy to Interfere with Civil Rights in Violation of 42 U.S.C. § 1985(3) (against all Defendants)**

96. Plaintiff alleges and incorporates by reference paragraphs 1-51 above.

97. Conspiracies to interfere with civil rights are actionable under 42 U.S.C. § 1985(3).

98. A plaintiff can bring a claim where they can show the existence of 1) a conspiracy, 2) for the purpose of depriving, either directly or indirectly, a person or class of persons of equal protection of the law, or of equal privileges or immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.

99. Under the second element, a plaintiff must show that the conspirator's actions were motivated by a class-based or otherwise invidiously discriminatory animus.

100. Defendants conspired to deprive Professor Ahmed of equal privileges and immunities under the law.

15

101. Defendant IRSC, through its employees, participated in the conspiracy by wrongfully terminating Professor Ahmed.

102. Defendant Dr. Moore participated in the conspiracy by directing the termination.

103. Defendant Doe Board Member participated in the conspiracy by directing Dr. Moore to Kaufman's article and directing Dr. Moore to terminate Professor Ahmed.

104. Defendants' invidiously discriminatory animus is apparent from their reliance on Kaufman's inflammatory article full of derogatory stereotypes about Muslims.

105. Finally, Professor Ahmed was harmed because he was deprived of three semesters teaching, in addition to emotional and reputational harm.

106. Therefore, Professor Ahmed requests this Court grant him declaratory and injunctive relief, as well as damages and reasonable attorney's fees.

## VI.     PRAYER FOR RELIEF

Plaintiff prays for judgment in his favor and against Defendants, and respectfully requests this Court grant the following relief:

1. Grant limited jurisdictional discovery to discover the identity of the Doe Defendant;

2. Grant declaratory judgment that the actions and omissions of Defendants, as described in this Complaint, violate the rights of Plaintiff;

3. Declare that Defendants violated Plaintiff's rights under the First Amendment of the United States Constitution,  Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1985(3);

4. Award compensatory damages in an amount to be determined at trial for the injuries caused by Defendants' unlawful conduct;

5. Award punitive damages against Defendant Moore in his individual capacity, in an amount sufficient to punish and deter willful and reckless violations of Plaintiff's constitutional and statutory rights;

6. Order that Defendants cease any and all ongoing or future discriminatory or other actions in violation of the law as set forth herein;

7. Award Plaintiff reasonable attorneys' fees, costs, and litigation expenses pursuant to 42 U.S.C. § 1988 and any other applicable law; and

8. Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

*Christopher C. Sharp*
Christopher C. Sharp, Esq.
Fla. Bar No. 996858
E-Mail: csharplaw@aol.com
SHARP LAW FIRM, P.A.
1600 West State Road 84, Suite C
Fort Lauderdale, Florida 33441
Telephone: (954) 909-4246

Local Counsel for Plaintiff

Chelsea G. Glover, Esq.
Email: cglover@clcma.org
*Pro Hac Vice Forthcoming*
Samira S. Elhosary
Email: selhosary@clcma.org
*Pro Hac Vice Forthcoming*
Jinan Chehade
Email: jchehade@clcma.org
*Pro Hac Vice Forthcoming*
MUSLIM LEGAL FUND OF AMERICA
100 North Central Expressway, Suite 1010
Richardson, Texas 75080
Phone: (954) 272-0490

Dated: December 3, 2025          Attorneys for Plaintiff